E-FILED
Monday, 20 October, 2025 02:10:40 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

**SHANNON PIERCE, MICHELLE WATSON, PATTY BENNETT, RILDA FIRKINS, BRIANA ACUNA, MICHAEL DANIELL, CARA HAENEL, and DEBORAH WARE** on behalf of themselves, and on behalf of all other similarly situated individuals,

Plaintiffs,

v.

**(1) COMMUNICATIONS DATA GROUP, INC. d/b/a CDG;**
**(2) DUO COUNTY TELEPHONE COOPERATIVE CORPORATION, INC. d/b/a DUO BROADBAND;**
**(3) CUMBERLAND CELLULAR, LLC, d/b/a DUO BROADBAND;** and
**(4) HOME WIRELESS, INC. d/b/a HOME TELECOM**

Defendants.

Case No. 2:25-CV-02170-JEH-RLH

**JURY TRIAL DEMANDED**

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Shannon Pierce, Michelle Watson, Patty Bennett, Rilda Firkins, Briana Acuna, Michael Daniell, Cara Haenel, and Deborah Ware (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" or "Class Members" (as further defined below)), bring this Consolidated Class Action Complaint against Defendants: (1) Communications Data Group, Inc. d/b/a CDG ("CDG"); (2) Duo County Telephone Cooperative Corporation, Inc. d/b/a Duo Broadband ("Duo"); (3) Cumberland Cellular, LLC, d/b/a Duo Broadband ("Cumberland") ; and (4) Home Wireless, Inc. d/b/a Home Telecom ("Telecom") (collectively, "Defendants"),

alleging as follows, based upon personal knowledge, upon information and belief, and investigation of counsel as to all other matters.

## I. INTRODUCTION

1. Plaintiffs bring this class action lawsuit against Defendants for their failure to protect and safeguard Plaintiffs' and the Class's (an estimated **42,518** individuals) highly sensitive personally identifiable information ("PII").[1] As a result of Defendants' negligence and insufficient data security, cybercriminals easily infiltrated CDG's inadequately protected computer systems and accessed the PII of Plaintiffs and the Class.[2] Now, Plaintiffs' and the Class's PII is in the hands of cybercriminals who will undoubtedly use their PII for nefarious purposes for the rest of their lives.

2. CDG is a billing vendor for service providers such as Duo, Cumberland, and Telecom.[3]

3. Plaintiffs and Class Members are customers of one or more of Defendants. As a condition of receiving services, Plaintiffs and Class Members were required to entrust their sensitive, non-public PII to one or more Defendants.

4. According to CDG, on or around February 13, 2025, CDG discovered a data security incident in which "cyber threat actor attempted to disrupt [CDG's] systems in a possible effort to deploy ransomware and solicit a ransom payment from [CDG]" (the "Data Breach" or

---

[1] *Data Breach Notifications*, *Duo County Telephone Cooperative Corporation, Inc. and Cumberland Cellular, LLC (doing business under the shared branding 'Duo Broadband')*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/943d1111-7f57-42a2-8259-b0de8e4ba981.html (last visited Oct. 7, 2025) (also containing a link to a sample Notice of Data Breach Letter sent to the victims of the Data Breach).

[2] *Id.*

[3] *Id.*

"Breach").[4]

5. The types of PII accessed without authorization during the Data Breach included—at least—names, addresses, dates of birth, and Social Security numbers (collectively, "Private Information").[5] As a result of Defendants' negligence, Plaintiffs and the Class face a certain and impending risk of harm.

6. Despite discovering the Breach in February 2025, CDG delayed alerting victims of the Data Breach until on or around May 15, 2025, when it began sending out notice of data breach letters ("Notice Letters") to the victims of the Data Breach.[6]

7. Defendants delayed and vague reporting caused Plaintiffs and Class Members to incur additional damages by diminishing their ability to timely and thoroughly address harms from the Data Breach, like by monitoring their account statements and obtaining identity theft protection services in the Data Breach's aftermath.

8. Shortly after the Data Breach, well-known ransomware group—Qilin—claimed responsibility for the Data Breach, as pictured below:[7]

[IMAGES ON FOLLOWING PAGE]

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] https://blog.rankiteo.com/com327051825-communications-data-group-ransomware-may-2025/; https://www.breachsense.com/breaches/communications-data-group-data-breach/; https://www.comparitech.com/news/telecom-saas-firm-communications-data-group-notifies-42k-people-of-data-breach-on-behalf-of-duo-broadband/.

Qilin

# Communications Data Group

## Data Breach on March 10, 2025

| Data Breach Report | |
|---|---|
| Victim | cdg.us |
| Threat Actor | Qilin |
| Date Discovered | Mar 10, 2025 |
| Description | Communications Data Group is a telecommunications software company that is operator-owned and operator-managed. |
| Leak Size | Unknown |

Qilin

Log In

← Back WWW.CDG.US

cdg

We are an operator-driven OSS/BSS provider with 250+ years combined support experience at your fingertips. Our top executives don't just run CDG, they also run a service provider. As a company owned and operated by a broadband provider, we have real-time market experience, just like the rest of our client community. We think that matters. We think that it makes a difference in how we listen, respond, and plan for the future.Our mission is to develop and deploy the best cloud-based, SaaS-delivered OSS/BSS platform in the market for service providers and carriers offering retail and wholesale broadband, data, utility, and interconnect services. Our development methodology is

WikileaksV2

jabber: qilin@exploit.im

TOX: 7C35408411AEEBD53CDBCEBAB167D7B22F1E...

ftp://dataShare:nX4aJxu3rYUMiLjCMtuJYTK...

ftp://dataShare:2bTWYKNn7aK7Rqp9mnv3@17...

9. Due to Defendants' negligence, cybercriminals accessed and obtained everything they need to commit identity theft and wreak havoc on the financial and personal lives of thousands of individuals.

10. Businesses that handle consumers' Private Information, like CDG, owe the individuals to whom the information relates a duty to adopt reasonable measures to protect it from disclosure and theft by unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory, and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that hackers with nefarious intentions will target the Private Information and use it to harm the affected individuals.

11. Similarly, businesses that collect consumers' Private Information—such as Duo, Cumberland, and Telecom—and provide this information to vendors and/or independent contractors like CDG—owe the individuals to whom the information relates a duty to ensure that the vendor and/or independent contractor utilizes and adopts reasonable measures to protect the Private Information from disclosure and theft and to keep it safe and confidential. This duty arises under contract, statutory, and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that hackers with nefarious intentions will target the Private Information and use it to harm the affected individuals.

12. Defendants could not perform their regular business activities or generate revenue without collecting and maintaining Plaintiffs' and Class Members' Private Information. Upon information and belief, Defendants retain the Private Information they collect for many years, even after their relationships with Plaintiffs and Class Members end.

13. Upon information and belief, the mechanism of the ransomware attack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to CDG, and thus, CDG knew that failing to take reasonable steps to secure the Private Information left it in a dangerous condition.

14. Similarly, the possibility of a ransomware attack and the potential for improper disclosure of Plaintiffs' and Class Members' Private Information if inadequate data security was used by a vendor and/or independent contractor was a known risk to Duo, Cumberland, and Telecom. Thus, Duo, Cumberland, and Telecom knew if they failed to select a vendor and/or independent contractor with adequate data security that Plaintiffs' and the Class's Private Information would be left in a dangerous and vulnerable condition.

15. The Data Breach, which CDG failed to detect until cybercriminals had already accessed Plaintiffs' and Class Members' Private Information, is the direct result of CDG's failure to implement basic data security measures or oversight over consumers' data in its custody and control. Had CDG implemented reasonable cybersecurity measures—including adequate safeguards for initial access, encryption, or redaction of personal data elements, and sufficient logging, monitoring, and alerting tools to detect unauthorized activity—cybercriminals would not have been able to hack into CDG's servers, perform reconnaissance necessary to locate Plaintiffs' and Class Members' Private Information, and then exfiltrate that data before being detected.

16. Furthermore, had Duo, Cumberland, and Telecom ensured CDG implemented reasonable cybersecurity measures ***prior*** to utilizing CDG's services—including adequate safeguards for initial access, encryption, or redaction of personal data elements, and sufficient logging, monitoring, and alerting tools to detect unauthorized activity—Plaintiffs and Class Members would not have suffered the harm alleged herein.

17. CDG failed to adequately protect Plaintiffs' and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive data when it was maintained on CDG's internet-accessible network without adequate safeguards against unauthorized access and exfiltration. This unencrypted, unredacted Private Information was compromised due to CDG's negligent acts and omissions and utter failure to protect it.

18. Similarly, Duo, Cumberland, and Telecom failed to adequately protect Plaintiffs' and Class Members' Private Information by failing to ensure the vendors and/or independent contractors they utilized, such as CDG, implemented industry standard data security procedures, practices, and protocols to protect Plaintiffs' and Class Members Private Information from hackers.

19. CDG breached its duties and obligations by failing in one or more of the following ways: (a) to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (b) to design, implement, and maintain reasonable data retention policies; (c) to adequately train or oversee its employees regarding data security; (d) to comply with industry standard data security practices; (e) to warn Plaintiffs and Class Members and/or their agents of CDG's inadequate data security practices; (f) to encrypt or adequately encrypt the Private Information that was stored on CDG's network server; (g) to recognize or detect that its network systems repository had been compromised and accessed, or the extent of information compromised, in a timely manner to mitigate the harm; (h) to utilize widely available software able to detect and prevent this type of attack; and (i) to otherwise adequately secure the Private Information using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

20. Duo, Cumberland, and Telecom breached their duties and obligations by: (a) failing

to ensure CDG designed, implemented, monitored, and maintained reasonable network safeguards against foreseeable threats; (b) failing to ensure CDG designed, implemented, and maintained reasonable data retention policies; (c) failing to ensure CDG adequately trained or oversaw its employees regarding data security; (d) failing to ensure CDG complied with industry standard data security practices; (e) failing to warn Plaintiffs and Class Members of CDG's inadequate data security practices; (f) failing to ensure CDG encrypted or adequately encrypted the Private Information that was stored on CDG's network server; (g) failing to ensure CDG had systems or processes in place to recognize or detect that CDG's network had been compromised and accessed; (h) failing to ensure CDG utilized widely available software able to detect and prevent this type of attack; and (i) failing to ensure CDG otherwise adequately secured the Private Information of Plaintiffs and the Class using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

21. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality and security of their Private Information. In providing their Private Information to one or more Defendants, Plaintiffs and Class Members reasonably expected Defendants would keep their Private Information confidential and secure, use this information for only legitimate business purposes, and disclose it only as authorized. Defendants failed to do so, resulting in the unauthorized disclosure of Plaintiffs' and Class Members' Private Information in the Data Breach.

22. Hackers targeted and obtained Plaintiffs' and Class Members' Private Information from CDG because of the data's value in exploiting and stealing Plaintiffs' and Class Members' identities. As a direct and proximate result of CDG's inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiffs' and Class Members' Private Information was accessed and acquired by cybercriminal ransomware group—Qilin—and exposed

to an untold number of unauthorized individuals. The present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes.

23. The harm resulting from a ransomware attack like this manifests in numerous ways including identity theft and financial fraud. The exposure of an individual's Private Information due to a data breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of his or her life. Mitigating that risk, to the extent even possible, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures. Plaintiffs and Class Members will be forced to allocate time to these tasks for years, if not their lifetimes, due to the Data Breach.

24. As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries in fact including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress in with dealing with the Data Breach; and (i) the continued risk to their sensitive Private Information, which remains in Defendants' possession and is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect the PII they collect and maintain.

25. To redress these harms, Plaintiffs and Class Members seek compensatory, nominal, statutory, and punitive damages, attorneys' fees and expenses, declaratory judgment, and injunctive relief requiring CDG to (a) disclose, expeditiously, the full nature of the Data Breach

and the types of Private Information exposed; (b) implement improved data security practices to reasonably guard against future breaches of Private Information; and (c) provide, at Defendants' own expense, all impacted Data Breach victims with lifetime identity theft protection services.

## II. PARTIES

***Plaintiffs***

26. Plaintiff **Shannon Pierce** is an individual domiciled in Kentucky. Plaintiff Pierce received a Notice Letter from CDG dated May 15, 2025, notifying her that her name, address, date of birth, and Social Security Number were impacted by the Data Breach. Upon information and belief, CDG acquired Plaintiff Pierce's Private Information through its relationship with Duo and/or Cumberland.

27. Plaintiff **Michelle Watson** is an individual domiciled in Kentucky. Plaintiff Watson received a Notice Letter from CDG dated May 15, 2025, notifying her that her name, address, date of birth, and Social Security Number were impacted by the Data Breach. Upon information and belief, CDG acquired Plaintiff Watson's Private Information through its relationship with Duo and/or Cumberland.

28. Plaintiff **Patty Bennett** is an individual domiciled in Kentucky. Plaintiff Bennett received a Notice Letter from CDG dated May 15, 2025, notifying her that her name, address, date of birth, and Social Security Number were impacted by the Data Breach. Upon information and belief, CDG acquired Plaintiff Bennett's Private Information through its relationship with Duo and/or Cumberland.

29. Plaintiff **Rilda Firkins** is an individual domiciled in Kentucky. Plaintiff Firkins received a Notice Letter from CDG dated May 15, 2025, notifying her that her name, address, date of birth, and Social Security Number were impacted by the Data Breach. Upon information and

belief, CDG acquired Plaintiff Firkins's Private Information through its relationship with Duo and/or Cumberland.

30. Plaintiff **Cara Haenel** is an individual domiciled in South Carolina. Plaintiff Haenel received a Notice Letter from Telecom dated April 14, 2025, notifying her that her name, address, date of birth, and Social Security Number were impacted by the Data Breach. Upon information and belief, CDG acquired Plaintiff Haenel's Private Information through its relationship with Telecom.

31. Plaintiff **Michael Daniell** is an individual domiciled in South Carolina. Plaintiff Daniell received a Notice Letter from Telecom dated April 14, 2025, notifying him that his name, address, date of birth, and Social Security Number were impacted by the Data Breach. Upon information and belief, CDG acquired Plaintiff Daniell's Private Information through its relationship with Telecom.

32. Plaintiff **Briana Acuna** is an individual domiciled in South Carolina. Plaintiff Acuna received a Notice Letter from Telecom dated April 14, 2025, notifying her that her name, address, date of birth, and Social Security Number were impacted by the Data Breach. Upon information and belief, CDG acquired Plaintiff Acuna's Private Information through its relationship with Telecom.

33. Plaintiff **Deborah Ware** is an individual domiciled in South Carolina. Plaintiff Ware received a Notice Letter from Telecom dated April 14, 2025, notifying her that her name, address, date of birth, and Social Security Number were impacted by the Data Breach. Upon information and belief, CDG acquired Plaintiff Ware's Private Information through its relationship with Telecom.

***Defendants***

34. Defendant **Communications Data Group, Inc.** is a Delaware corporation. CDG is headquartered at 2107 S. Neil Street, Champaign, Illinois 61820. CDG's registered agent is Kim Belanger, who can be served at the same address.

35. Defendant **Duo County Telephone Cooperative Corporation, Inc.** is a corporation incorporated in Kentucky and with its principal place of business at 2150 N Main Street, Jamestown, Kentucky 42629. Duo County Telephone Cooperative Corporation, Inc.'s registered agent is Thomas E. Preston, who can be served at 2150 North Highway 127 P.O. Box 80, Jamestown, Kentucky, 42629.

36. Defendant **Cumberland Cellular, LLC** is a is a limited liability company formed under the laws of Kentucky and with its principal place of business at 2150 N. Main Street, Jamestown, Kentucky 42629. Defendant Cumberland Cellular, LLC's registered agent is Daryl L. Hammond, who can be served at 2150 North Main Street Jamestown, Kentucky, 42629.

37. Defendant **Home Wireless, Inc.** is a telecommunications company with its corporate headquarters located at 579 Stoney Landing Road, Moncks Coner, South Carolina 29461. Defendant Home Wireless, Inc.'s registered agent is R.L. Helmly, who can be served at 100 Tram St., Moncks Corner, South Carolina.

## III. JURISDICTION AND VENUE

38. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different than Defendants.

39. This Court has personal jurisdiction over CDG because it is headquartered in Illinois. CDG regularly conducts business in Illinois and the acts and omissions giving rise to

Plaintiffs' claims occurred in and emanated from Illinois.

40. This Court has personal jurisdiction over Duo because it regularly conducts business in Illinois and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from Illinois.

41. This Court has personal jurisdiction over Cumberland because it regularly conducts business in Illinois and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from Illinois.

42. This Court has personal jurisdiction over Telecom because it regularly conducts business in Illinois through its relationship to CDG, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from Illinois.

43. Defendants purposely availed themselves of the rights and benefits of the state of Illinois by engaging in activities including: (a) directly and/or through their affiliates and agents providing services in this District; (b) conducting substantial business in this District; (c) having a registered agent to accept service of process in the state of Illinois; and/or (d) engaging in other persistent courses of conduct and/or deriving revenue from services provided in Illinois and in this District.

44. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants reside within this District and/or have purposefully engaged in activities, including transacting business, in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events and/or omissions giving rise to the claims herein emanated from within this District, including the Data Breach at issue.

## IV. GENERAL FACTUAL ALLEGATIONS

### A. Defendants Collect and Maintain Private Information as Part of their Business Operations for Profit.

45. CDG provides billing and operational management solutions for its clients located in the United States and Canada.[8]

46. CDG's clients are service providers that offer telephone, cable, internet, and other services to their customers.[9]

47. Upon information and belief, Duo, Cumberland, and Telecom utilize CDG's services.

48. It is estimated that CDG's annual revenue is $25 million per year.[10] In other words, CDG could have afforded to implement adequate data security prior to the Data Breach but deliberately chose not to.

49. In the ordinary course of business, CDG receives the Private Information from individuals, such as Plaintiffs and the Class, from the entities that utilize CDG's services.

50. Defendants obtain, collect, use, and derive a benefit from the Private Information of Plaintiffs and Class Members. Defendants use the Private Information they collect to provide services, making a profit therefrom. Defendants would be unable to obtain revenue if not for the acceptance and use of Plaintiffs' and the Class's Private Information.

51. As a result, Plaintiffs' and Class Members' Private Information was accessed and stolen from CDG's inadequately secured networks in a massive and preventable Data Breach.

52. Defendants derived economic benefits from collecting and using Plaintiffs' and Class Members' Private Information.

---

[8] https://cdg.us/privacy/.
[9] *Id.*
[10] https://growjo.com/company/Communications_Data_Group_(CDG)#google_vignette.

53. Without the required submission of Private Information, CDG could not perform its operations, furnish the services it provides, or receive payment for those services.

54. As a condition of and in exchange for receiving services, Plaintiffs and Class Members were required to entrust their highly sensitive Private Information to CDG, either directly or through Duo, Cumberland, and Telecom who contracted with CDG for services.

55. The data Defendants collect and maintain in the ordinary course of business includes full names, addresses, dates of birth, Social Security numbers, and other sensitive data.

56. At all relevant times, CDG knew it was storing and using its network to store and transmit valuable, sensitive Private Information and that as a result, its systems would be attractive targets for cybercriminals.

57. CDG also knew that any breach of its information technology network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the thousands of individuals whose Private Information was compromised, as well as intrusion into their private and sensitive personal matters.

58. In exchange for receiving Plaintiffs' and Class Members' Private Information, CDG promised to safeguard the sensitive and confidential data, to use it only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

59. Upon information and belief, CDG made promises and representations that the Private Information it collected, directly and indirectly, would be kept safe and confidential, that the information's privacy would be maintained, and that CDG would delete any sensitive information after it was no longer required to maintain it.

60. According to information and belief, CDG made promises in writing, through privacy statements and related representations in documents provided to Plaintiffs and Class Members and/or Duo, Cumberland, and Telecom in connection with the services it provided, to keep Plaintiffs' and Class Members' Private Information confidential through reasonable and legally compliant data security measures.

61. Based on the foregoing representations and warranties, and to obtain services from CDG, Plaintiffs and Class Members provided their Private Information to CDG with the reasonable expectation and mutual understanding that CDG would comply with its obligations to keep such information confidential and protected. Alternatively, Plaintiffs and Class Members provided their Private Information to Duo, Cumberland, and/or Telecom with the reasonable expectation and mutual understanding that Duo, Cumberland, and/or Telecom would comply with its obligations to keep such information confidential and protected and would only utilize vendors and/or contractors with adequate data security.

62. The data CDG held in its systems at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class Members.

63. By collecting Plaintiffs' and the Class's Private Information, Defendants assumed legal and equitable duties to Plaintiffs and the Class to protect and safeguard their Private Information from unauthorized access and intrusion.

64. CDG recognizes this duty and makes the following claim on its website regarding its protection of sensitive data:

> To protect customer and company information from unauthorized access and use, CDG uses security measures that comply with federal / state law and standard industry practices. These measures include computer safeguards and secured files and buildings.[11]

---

[11] *Id.*

65. CDG's assurances of maintaining high standards of cybersecurity make it evident that CDG recognized it had a duty to use reasonable measures to protect the Private Information that it collected and maintained.

66. CDG violated its own privacy statement and failed to adopt reasonable and appropriate security practices and procedures including administrative, physical security, and technical controls to safeguard Plaintiff's and the Class's Private Information.

### B. CDG Owed Duties to Adopt Reasonable Data Security Measures for Private Information it Collected and Maintained.

67. As part of its business, CDG collects thousands of individuals' Private Information, including that of Plaintiffs and Class Members, storing their Private Information on its network server(s).

68. CDG had and continues to have duties to adopt reasonable measures to keep Plaintiffs' and Class Members' Private Information confidential and protected from disclosure to unauthorized third parties, and to audit, monitor, and verify the integrity of its network server(s) where Private Information is stored.

69. CDG had and has obligations stemming from the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45, common law, contract, and industry standards, to keep Plaintiffs' and Class Members' Private Information confidential and protected from unauthorized disclosure.

70. Additionally, by obtaining, using, and benefitting from Plaintiffs' and Class Members' Private Information, CDG assumed legal and equitable duties and knew or should have known it was responsible for protecting that Private Information from unauthorized access and disclosure.

71. CDG also owed a duty to protect Plaintiffs and Class Members from the harm that insufficient data security and consequential exposure of their Private Information would cause, because such harm was foreseeable and reasonably preventable.

72. CDG knew it was storing valuable, sensitive Private Information in its network server(s) and that as a result, those systems would be an attractive target for cybercriminals—such as Qilin.

73. CDG also knew that any breach of its systems and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the thousands of individuals whose Private Information was compromised, as well as intrusion into their private and sensitive personal matters.

74. CDG's duty to protect Plaintiffs and Class Members from the foreseeable risk of injury that inadequate data protection and unauthorized exposure of their Private Information would cause obligated CDG to implement reasonable practices to keep Plaintiffs' and Class Members' sensitive Private Information confidential and securely maintained through reasonable, industry-standard, and legally compliant measures.

75. Additionally, upon information and belief, all contracts CDG entered into with its clients—such as Duo, Cumberland, and Telecom—required CDG to implement and maintain reasonable, adequate, and legally compliant cybersecurity measures to protect its Plaintiffs' and the Class's Private Information against unauthorized disclosure and exfiltration.

76. Plaintiffs and Class Members were and are the intended beneficiaries of CDG's contractual obligation of reasonable, industry standard, and legally compliant data security for Duo's, Cumberland's , and Telecom's clients' Private Information.

77. CDG's contractual obligations to safeguard Plaintiffs' and Class Members' Private Information are an additional source of CDG's duty to protect Plaintiffs' and Class Members' Private Information in its custody and control.

78. CDG owed the foregoing duties to protect Private Information maintained on its network systems from unauthorized disclosure and had the practical ability to fulfill those duties—yet CDG failed to do so.

### C. Defendants Failed to Adequately Safeguard Plaintiffs' and Class Members' Private Information, Resulting in a Massive and Preventable Data Breach.

79. According to CDG's Notice Letters, on February 13, 2025, CDG discovered a data security incident in which a cyber threat actor attempted to disrupt its systems in an effort to deploy ransomware and solicit a ransom payment.[12]

80. CDG claims it took actions to secure its systems, but on March 17, 2025, CDG detected unauthorized access to systems containing the Private Information of Plaintiffs and the Class.[13]

81. The Private Information stolen in the Data Breach included names, Social Security numbers, addresses, and dates of birth.[14]

82. Despite discovering the Data Breach in February 2025, CDG did not begin notifying individuals of the Data Breach until May 2025—months later.

83. Omitted from the Notice Letters were the details of the root cause of the Data Breach, the identity of the perpetrator of the Data Breach (Qilin), the vulnerabilities exploited,

---

[12] *Data Breach Notifications*, *Duo County Telephone Cooperative Corporation, Inc. and Cumberland Cellular, LLC (doing business under the shared branding 'Duo Broadband')*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/943d1111-7f57-42a2-8259-b0de8e4ba981.html (last visited Oct. 17, 2025).

[13] *Id.*

[14] *Id.*

when the Data Breach began and ended, and the remedial measures undertaken to ensure such a data breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is protected. Thus, CDG's purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

84. In recognition of the severity of the Data Breach, and the imminent risk of harm Plaintiff and the Class face, CDG made a measly offering of twelve (12) months of credit monitoring services. Such an offering is inadequate and will not prevent identity theft but will only alert Data Breach victims once identity theft has already occurred.

85. All in all, CDG failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access and exploitation.

86. Defendant's actions represent a flagrant disregard of the rights of Plaintiff and the Class, both as to privacy and property.

87. In March 2025, notorious criminal ransomware gang—Qilin—claimed responsibility for the Data Breach.[15]

88. "Qilin is a ransomware gang that started claiming responsibility for attacks on its data leak site in late 2022. Also known as Agenda, Qilin is a Russia-based hacking group that mainly targets victims through phishing emails to spread its ransomware. It launched in August

[15] https://www.comparitech.com/news/telecom-saas-firm-communications-data-group-notifies-42k-people-of-data-breach-on-behalf-of-duo-broadband/.

2022 and runs a ransomware-as-a-service business in which affiliates pay to use Qilin's malware to launch attacks and collect ransoms."[16]

89. "The attack on CDG and Duo Broadband isn't Qilin's first strike at utilities. Aiken Electric Cooperative notified 4,600 people in September 2024 of a data breach claimed by Qilin."[17]

90. "Ransomware attacks on US utilities can disrupt billing, communication, access to files, and, in more extreme cases, service delivery. The attacks can lock down computer systems and steal data. Utilities must then pay a ransom to restore their systems and for the ransomware group to refrain from selling or publicly releasing the stolen data. If they don't, utilities face extended downtime, data loss, and putting customers at increased risk of fraud."[18]

91. Since it is confirmed that Plaintiff's and the Class's Private Information was stolen by Qilin—as evidenced by Qilin's dark web positing pictured above—they are at an imminent risk of fraud and identity theft.

92. Upon information and belief, had CDG implemented standard and reasonable digital forensic measures such as timestamping, intrusion detection systems, and logging aspects, it would be prepared for a forensic investigation of compromised information and would not need approximately months to identify the information involved in the Data Breach. These failures exacerbated Plaintiffs' and Class Members' damages, including actual damages in the form of lost time, lost opportunity costs, among others, and by delaying and obfuscating CDG's notice of the Data Breach and depriving Plaintiffs and Class Members of crucial time to mitigate and address it in a timely manner, like by putting credit freezes on their accounts or obtaining identity theft protection services.

[16] *Id.*
[17] *Id.*
[18] *Id.*

93. To make matters worse, CDG waited months after the Data Breach occurred to begin notifying Plaintiffs and Class Members that the sensitive Private Information they entrusted to CDG is now in criminal hackers' possession. This unreasonable and unexplained delay deprived Plaintiffs and Class Members of crucial time to address and mitigate the heightened risk of identity theft and other harms resulting from the Data Breach.

94. Plaintiffs' and Class Members' Private Information was targeted, accessed, and stolen by Qilin in the Data Breach. Indeed, the threat of harm has already materialized. Qilin has stolen Plaintiffs' and the Class's Private Information and has published their Private Information on the dark web, as pictured above.

95. CDG's insufficient data security for Plaintiffs' and the Class's Private Information caused and allowed Qilin to target and take files containing Plaintiffs' and Class Members inadequately protected, unencrypted Private Information from CDG's network servers, and unreasonably delayed Plaintiffs' and Class Members' notice by months.

96. As the Data Breach and its timeline evidences, CDG did not use reasonable data security measures appropriate to the nature of the sensitive Private Information collected from Plaintiffs and Class Members and maintained on CDG's network server(s), such as encrypting the information, deleting the data from CDG's server when it was no longer needed, requiring sufficient verification such as multi-factor authentication for accounts with access servers storing Private Information, training employees about cybersecurity and attempts to gain unauthorized access, investigating and addressing vulnerabilities in its data security practices, and/or implementing the necessary safeguards to enable CDG to identify malicious activity and curtail it when it happens. These failures allowed and caused cybercriminals to target CDG's network systems and carry out the Data Breach.

97. CDG could and should have prevented this Data Breach by ensuring its files and servers containing Plaintiffs' and Class Members' Private Information were properly secured, sanitized, and encrypted and by using appropriate clearinghouse practices to purge consumer data that it was no longer required to maintain, but it failed to do so.

98. CDG could and should have properly monitored its network for unauthorized access and unusual activity, including the downloading of large amounts of sensitive personal information from its network.

99. Additionally, CDG could have prevented the Data Breach by examining, testing, and updating its cybersecurity practices to ensure vulnerabilities were identified and addressed and reasonable safeguards were continuously maintained, but failed to do so.

100. CDG's tortious conduct and breach of contractual obligations, as detailed in herein, are evidenced by its failure to identify the scope of information involved and/or individuals impacted by the Data Breach until months after cybercriminals breached its network and accessed Plaintiffs' and Class Members' Private Information stored therein—meaning CDG had no effective means in place to ensure that cyberattacks were detected, prevented, or timely investigated.

101. CDG's negligence in safeguarding Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data.

**D. Duo, Cumberland, and Telecom Negligently Utilized CDG's Services.**

102. Duo, Cumberland, and Telecom were negligent and failed to confirm when retaining CDG's services that Plaintiffs' and Class Members' Private Information would be protected from unauthorized access, that CDG maintained adequate data security procedures, practices, infrastructure, and protocols, and that Plaintiffs' and the Class's Private Information

would not be subject to unauthorized access and exfiltration.

103. Duo, Cumberland, and Telecom owed, and continue to owe, duties of care to Plaintiffs and Class Members to: (a) exercise reasonable care to secure and protect the Private Information in their possession and the Private Information in the possession of any entity they hired to provide services—such as CDG—from unauthorized access; (b) ensure CDG implements adequate data security practices, procedures, infrastructure, and protocols compliant with applicable law and industry standards; (c) ensure CDG has adequate processes in place to quickly detect a data breach and to timely act on warnings regarding data breaches; (d) investigate CDG's data security practices, infrastructure, procedures, and protocols *prior* to retaining CDG; and (e) monitor CDG's security procedures, practices, and protocols during the entirety of the relationship.

104. Duo, Cumberland, and Telecom utterly failed to uphold these duties, as evidenced by the Data Breach, thereby breaching its duties owed to Plaintiffs and the Class.

105. As a direct and proximate cause of the Duo's Cumberland's and Telecom's breaches, and failure to properly interview and vet CDG, Plaintiffs and the Class have been damaged as set forth herein.

### E. Defendants Knew of the Risk of a Cyberattack because Businesses in Possession of Private Information are Particularly Susceptible to Data Breaches.

106. Defendants' negligence, including their gross negligence in failing to safeguard Plaintiffs' and Class Members' Private Information, is exacerbated by the repeated warnings and alerts directed to protect and secure sensitive data.

107. Private Information—including the types accessed in the Data Breach—are of great value to cybercriminals because this information can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the internet black market known as the dark web.

108. Private Information can also be used to distinguish, identify, or trace an individual's identity, such as his or her name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information connected or linked to an individual such as his or her birthdate, birthplace, and mother's maiden name.

109. Data thieves regularly target entities that store Private Information—like CDG—due to the highly sensitive information they maintain. CDG knew and understood that Plaintiffs' and Class Members' Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize it through unauthorized access.

110. Cyberattacks against institutions like CDG are targeted and frequent.

111. According to the Identity Theft Resource Center's report covering the year 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[19] As stated in IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[20]

112. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in CDG's industry, including CDG itself.

113. CDG's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting entities like CDG that collect and store Private Information preceding the date of the subject Data Breach.

---

[19] *See 2021 Annual Data Breach Report Sets New Record for Number of Compromises*, ITRC (Jan. 24, 2022), available at: https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises.

[20] *Cost of a data breach 2022: A million-dollar race to detect and respond*, IBM, available at: https://www.ibm.com/reports/data-breach.

114. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,862) set in 2021.

115. Additionally, as companies became more dependent on computer systems to run their business,[21] e.g., working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[22]

116. CDG knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for it.

117. CDG was clearly aware of the risks it was taking and the harm that could result from inadequate data security but threw caution to the wind.

118. Similarly, Duo, Cumberland, and Telecom knew the importance of selecting a vendor and/or independent contractor with adequate data security given the well-publicized rise in data breaches but failed to ensure CDG deployed adequate data security.

119. As a business in possession of consumers' Private Information, CDG knew, or should have known, the importance of safeguarding the Private Information entrusted to it, directly

---

[21] *FEDS Notes*, *Implications of Cyber Risk for Financial Stability*, BD. GOVERNORS OF THE FED. RES. SYS., (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[22] Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS, (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

and indirectly, by Plaintiffs and Class Members, and of the foreseeable consequences if its network systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to their Private Information's disclosure to cybercriminals. Nevertheless, CDG failed to implement or follow reasonable cybersecurity measures to protect against the foreseeable harm of this Data Breach.

120. Additionally, as businesses in possession of consumers' Private Information, Duo, Cumberland, and Telecom knew or should have known, the importance of safeguarding the Private Information entrusted to it, directly and indirectly, and of the foreseeable consequences if it willingly gave Plaintiffs' and the Class's Private Information to a vendor and/or independent contractor with inadequate data security—such as CDG. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to their Private Information's disclosure to cybercriminals.

121. CDG was, or should have been, fully aware of the unique type and the significant volume of data on its network server(s), amounting to thousands of individuals detailed Private Information, and, thus, the wide extent of individuals who the exposure of that unencrypted data would harm.

122. Given the nature of the Data Breach, it was foreseeable that Plaintiffs' and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways. Indeed, anyone who chooses to download Plaintiffs' and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiffs' and Class Members' names.

123. Plaintiffs and Class Members were the foreseeable and probable victims of CDG's inadequate security practices and procedures. The breadth of Private Information compromised in

the Data Breach makes the information particularly valuable to cybercriminals and leaves Plaintiffs and Class Members especially vulnerable to identity theft, and financial fraud.

**F. CDG was Required, but Failed, to Comply with FTC Rules and Guidance.**

124. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

125. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which establishes cyber-security guidelines for businesses like CDG. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

126. The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

127. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

128. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ

reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like CDG must undertake to meet their data security obligations.

129. Such FTC enforcement actions include actions against entities in the healthcare industry like CDG. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

130. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as CDG, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above are also a basis of CDG's duties in this regard.

131. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit." CDG itself profits from collecting and managing Plaintiffs' and Class Members' data.

132. CDG failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

133. CDG's failure to employ reasonable and appropriate means to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

**G. CDG Failed to Comply with Industry Standards.**

134. A number of published industry and national best practices are widely used as a go-to resource when developing an institution's cybersecurity standards.

135. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

136. The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

137. Further still, CISA makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.

138. Upon information and belief, CDG failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

139. Additionally, as explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[23]

140. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, CDG could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

a. Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d. Configure firewalls to block access to known malicious IP addresses.

e. Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f. Set anti-virus and anti-malware programs to conduct regular scans automatically.

---

[23] *See How to Protect Your Networks from RANSOMWARE*, at 3, FBI, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

g. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h. Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

j. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

k. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

l. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m. Execute operating system environments or specific programs in a virtualized environment.

n. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[24]

141. Further, CDG could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

[24] *Id.* at 3–4.

a. **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

b. **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

c. **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

d. **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

e. **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

f. **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want

to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

g. **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[25]

142. Given that CDG was storing the Private Information of thousands of individuals, it could have and should have implemented all the above measures to prevent and detect ransomware attacks.

143. Specifically, among other failures, CDG had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[26]

144. CDG should have also limited remote access credentials for portions of its network on which Private Information was stored to ensure that stolen credentials cannot be used to access its entire network.

145. Moreover, it is a well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed. The FTC, among others, has repeatedly emphasized the importance of disposing of unnecessary Private Information: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by

---

[25] *See Security Tip (ST19-001) Protecting Against Ransomware*, CISA (original release date Apr. 11, 2019), available at: https://www.cisa.gov/news-events/news/protecting-against-ransomware.

[26] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, FORTRA (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

hackers."[27] CDG, rather than following this basic standard of care, kept thousands of individuals unencrypted Private Information indefinitely, years after the customer relationship ended.

146. In summary, the Data Breach could have readily been prevented using industry standard network segmentation and encryption of all Private Information.

147. The Data Breach could have also been readily prevented by: (a) using two-factor authentication; (b) regularly changing usernames and passwords and using strong usernames and passwords; (c) updating all software often and regularly; (d) using firewalls to restrict access; and (e) network level authentication for remote desktop connection.

148. Further, the scope of the Data Breach could have been dramatically reduced had CDG utilized proper record retention and destruction practices.

### H. Defendants Owed Plaintiffs and Class Members Common Law Duties to Safeguard their Private Information.

149. In addition to its obligations under federal and state laws, CDG owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. These duties owed to Plaintiffs and Class Members obligated CDG to provide reasonable data security consistent with industry standards and requirements to protect Plaintiffs' and Class Members' Private Information in its care from unauthorized disclosure, and to timely and adequately warn Plaintiffs and Class Members in the event their Private Information was compromised.

[27] *Protecting Personal Information: A Guide for Business*, FTC, available at: https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf, at p. 6.

150. Furthermore, Duo, Cumberland, and Telecom owed a duty to Plaintiffs and Class Members to exercise reasonable care in selecting a vendor and/or independent contractor such as CDG. Duo, Cumberland, and Telecom should have ensured that any vendor and/or independent contractor they selected secured, safeguarded, protected, retained, and deleted, the Private Information in its possession to avoid it from being compromised, lost, stolen, accessed, and misused by unauthorized persons. These duties owed to Plaintiffs and Class Members obligated Duo, Cumberland, and Telecom to select a vendor and/or independent contractor with reasonable data security consistent with industry standards and requirements to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure, and to timely and adequately warn Plaintiffs and Class Members in the event their Private Information was compromised.

151. CDG owed duties to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information on how to adequately protect the data.

152. Duo, Cumberland, and Telecom owed duties to Plaintiffs and Class Members to ensure any vendor and/or independent contractor hired created and implemented reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training their employees and others who accessed Private Information on how to adequately protect the data

153. CDG owed duties to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner, before thousands of individuals' Private Information was taken.

154. Duo, Cumberland, and Telecom owed duties to Plaintiffs and Class Members to ensure any vendor and/or independent contractor hired implemented processes that would detect a compromise of Private Information in a timely manner, before millions of individuals' Private Information was taken.

155. CDG owed duties to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

156. Duo, Cumberland, and Telecom owed duties to Plaintiffs and Class Members to ensure any vendor and/or independent contractor hired acted upon data security warnings and alerts in a timely fashion

157. CDG owed duties to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred, and the extent of Private Information involved.

158. Duo, Cumberland, and Telecom owed duties to Plaintiffs and Class Members to ensure any vendor and/or independent contractor they utilized disclosed in a timely and accurate manner when and how the Data Breach occurred, and the extent of Private Information involved.

159. CDG owed duties to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

160. Duo, Cumberland, and Telecom owed duties to Plaintiffs and Class Members because they were foreseeable and probable victims of any vendors and/or independent contractors with inadequate data security practices.

161. CDG failed to take the necessary precautions to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure. CDG's actions and omissions represent a flagrant disregard of Plaintiffs' and Class Members' rights.

162. Duo, Cumberland, and Telecom failed to take the necessary precautions to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure. Duo's, Cumberland's, and Telecom's actions and omissions represent a flagrant disregard of Plaintiffs' and Class Members' rights.

### I. Plaintiffs and Class Members Suffered Common Injuries and Damages due to Defendants' Misconduct.

163. CDG's failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately injured Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

164. Duo's Cumberland's and Telecom's failure to ensure the vendor and/or independent contractor they utilized implemented or maintained adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately injured Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

165. The ramifications of Defendants' failures to keep Plaintiffs' and Class Members' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

166. Plaintiffs and Class Members are also at a continued risk because their Private Information remains in CDG's systems, which have already been shown to be susceptible to compromise and are subject to further attack, so long as CDG fails to undertake the necessary and appropriate security and training measures to protect its customers' Private Information.

167. Upon information and belief, Plaintiffs and Class Members are also at a continued risk of harm because Duo, Cumberland, and Telecom have not ceased using CDG's services. Plaintiffs and Class Members are subject to further attack so long as Duo, Cumberland, and Telecom negligently continue to use CDG's services.

168. As a result of CDG's ineffective and inadequate data security practices, the consequential Data Breach, and the foreseeable outcome of Plaintiffs' and Class Members' Private Information ending up in criminals' possession, all Plaintiffs and Class Members have suffered and will continue to suffer the following actual injuries and damages, without limitation: (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft, and related lost opportunity costs; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of the benefit of their bargain with CDG; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in CDG's possession and is subject to further unauthorized disclosures so long as CDG fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

169. As a result of Duo, Cumberland, and Telecom failing to ensure CDG implemented adequate data security practices—resulting in the consequential Data Breach—all Plaintiffs and Class Members have suffered and will continue to suffer the following actual injuries and damages, without limitation: (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft, and related lost opportunity costs; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of the benefit of their bargain; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in CDG's

possession and is subject to further unauthorized disclosures so long as Duo, Cumberland, and Telecom continue to use CDG's services.

***The Risk of Identity Theft to Plaintiffs and Class Members is Present and Ongoing.***

170. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

171. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[28] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[29]

172. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

173. The dark web is an unindexed layer of the internet that requires special software or authentication to access.[30] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on

---

[28] 17 C.F.R. § 248.201 (2013).
[29] *Id.*
[30] Louis DeNicola, *What Is the dark web?*, EXPERIAN (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[31] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

174. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, PII like the Private Information at issue here.[32] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[33] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[34]

175. The unencrypted Private Information of Plaintiffs and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized actors can easily access and misuse Plaintiffs' and Class Members' Private Information due to the Data Breach.

176. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

[31] *Id.*
[32] *What is the dark web?*, MICROSOFT 365 (July 15, 2022), https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.
[33] *Id.*; Louis DeNicola, *What Is the dark web?*, EXPERIAN (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.
[34] *What is the dark web?*, MICROSOFT 365 (July 15, 2022), https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

177. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

178. Another such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[35]

179. With "Fullz" packages, cybercriminals can cross-reference two (2) sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

---

[35] "Fullz" is fraudster speak for data that includes the victim's information, including but not limited to name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Recs. for Sale in Underground Stolen from Texas Life Ins. Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

180. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

181. Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

182. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

183. The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

184. Social Security numbers, for example, are among the worst kind of personal information to have been stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use

> your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[36]

185. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[37] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[38]

186. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[39] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[40]

187. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of

---

[36] *Identity Theft and Your Social Security Number*, Pub. No. 06-10064, SOCIAL SECURITY ADMIN. (June 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.
[37] *See Avoid Identity Theft: Protect Social Security Numbers*, SOCIAL SECURITY ADMIN., https://www.ssa.gov/phila/ProtectingSSNs.htm.
[38] *Id.*
[39] *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft .
[40] *See* Julia Kagan, *What is an SSN? What to Know About Social Security Numbers*, INVESTOPEDIA (Sept. 2, 2024), https://www.investopedia.com/terms/s/ssn.asp.

misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

188. Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[41]

189. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for credit lines.[42]

190. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft.

191. Similarly, the California state government warns consumers: "Originally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of

---

[41] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[42] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMIN. (2018), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[43]

192. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice,

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[44]

193. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[45]

194. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[46] Yet, CDG failed to rapidly report to Plaintiffs and Class Members that their Private Information was stolen.

195. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

---

[43] *See Your Social Security Number: Controlling the Key to Identity Theft*, OFFICE OF THE ATTORNEY GENERAL OF CAL., https://oag.ca.gov/idtheft/facts/your-ssn.
[44] Erika Harrell, *Bureau of Just. Stat.*, NCJ 256085, U.S. DEP'T OF JUST., *Victims of Identity Theft*, 2018 I (2020), available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.
[45] *See 2019 Internet Crime Report Released*, FBI (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited April 1, 2025).
[46] *Id.*

196. In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

197. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Loss of Time to Mitigate the Risk of Identify Theft and Fraud.***

198. As a result of the recognized risk of identity theft, when a data breach occurs, an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

199. In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face substantial costs and time to repair the damage to their good name and credit record.

200. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

201. Plaintiffs and Class Members have spent time, and will spend additional time in the

future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

202. These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[47]

203. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of CDG's conduct and failures that caused the Data Breach.

***Diminished Value of Private Information.***

204. Private Information is a valuable property right.[48] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt

---

[47] *See What to do Right Away, FTC*, https://www.identitytheft.gov/Steps.
[48] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PRIVATE INFORMATION") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3–4 (2009) ("PRIVATE INFORMATION, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

that Private Information has considerable market value. Indeed, CDG itself profits from Plaintiffs' and Class Members' data.

205. For example, drug and medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongly disclosed PHI to adjust their insureds' medical insurance premiums.

206. Private Information can sell for as much as $363 per record according to the Infosec Institute.[49]

207. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[50] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[51] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[52]

208. As a result of the Data Breach, Plaintiffs,' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized release onto the dark web, where it holds significant value for the threat actors.

---

[49] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ .

[50] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, LA TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[51] DATACOUP, https://datacoup.com/.

[52] *Frequently Asked Questions*, NIELSEN, available at: https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

209. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

***Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary.***

210. To date, Defendants have done little to nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach.

211. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money, filing false tax returns, taking out loans or lines of credit, or filing false unemployment claims.

212. Such fraud may go undetected until debt collection calls commence months or even years later. An individual may not know that her or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

213. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data

breach, where victims can easily cancel or close credit and debit card accounts.[53] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers). Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future, if not forever.

214. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from CDG's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for CDG's failure to safeguard their Private Information.

***Loss of Benefit of the Bargain.***

215. Furthermore, CDG's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

216. When agreeing to provide their Private Information, directly or indirectly, which was a condition precedent to obtain benefit administration, data management, and related services from CDG, and paying CDG, directly or indirectly, for these products and services, Plaintiffs and Class Members understood and expected that they were, in part, paying a premium for services and data security to protect the Private Information they were required to provide.

217. In fact, CDG did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than they reasonably expected to receive under the bargains struck with CDG.

---

[53] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The dark web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

## V. PLAINTIFFS' EXPERIENCES AND INJURIES

***Plaintiff Pierce***

218. Plaintiff Pierce is a current customer of Defendants and has been a customer of Defendants since 2020.

219. Defendants CDG, Duo and Cumberland obtained Plaintiff Pierce's Private Information in the course of their regular business operations.

220. Upon information and belief, at the time of the Data Breach, Defendants CDG, Duo and Cumberland maintained and had access to Plaintiff Pierce's Private Information on their systems.

221. Plaintiff Pierce received a Notice Letter from Defendant CDG after the Data Breach. According to the Notice Letter, Plaintiff Pierce's Private Information was improperly accessed and/or obtained by unauthorized third parties, including her: name, address, date of birth, and Social Security number.

222. Plaintiff Pierce is very careful about sharing her Private Information. Plaintiff Pierce stores any documents containing her Private Information in a safe and secure location. Plaintiff Pierce has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Pierce would not have entrusted her Private Information to Defendants CDG, Duo and Cumberland had she known of Defendants' CDG, Duo and Cumberland's lax data security.

223. To obtain services from Defendants CDG, Duo and Cumberland, Plaintiff Pierce was required to provide her Private Information to Defendants CDG, Duo and Cumberland. This included, among other things, her name, date of birth, address, Social Security number, and financial information to make payments online.

224. As a result of the Data Breach, Plaintiff Pierce made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff Pierce has spent significant time dealing with the Data Breach—valuable time Plaintiff Pierce otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

225. As a result of the Data Breach, Plaintiff Pierce made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Pierce monitors her Private Information multiple times a week and has already spent hours dealing with the Data Breach. This is valuable time Plaintiff Pierce otherwise would have spent on other activities.

226. Plaintiff Pierce suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (a) invasion of privacy; (b) theft of Private Information; (c) lost or diminished value of Private Information; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (e) loss of benefit of the bargain; (f) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (g) statutory damages; (h) nominal damages; and (i) the continued and certainly increased risk to her Private Information, which: (1) remains unencrypted and available for unauthorized third parties to access and abuse; and (2) remains in Defendants' CDG, Duo and Cumberland's possession and is subject to further unauthorized disclosures so long as Defendants CDG, Duo and Cumberland fail to undertake appropriate and adequate measures to protect her Private Information.

227. After the Data Breach, Plaintiff Pierce suffered a fraudulent and unauthorized credit inquiry. In or around June or July 2025, an unauthorized third-party attempted to obtain a credit card under her name. Upon information and belief, this instance of fraud is directly related to the Data Breach because the PII needed to perpetrate the fraudulent inquiry was the same PII exposed in the Data Breach.

228. Plaintiff Pierce also suffered actual injury from the dramatic increase in spam communications after the Data Breach. These spam communications suggest that her Private Information has been stolen and is now in the hands of cybercriminals. The spam varies in its content but includes texts and calls about Medicare and other types of benefits, as well as debt consolidation.

229. As a result of the Data Breach, Plaintiff Pierce anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

230. As a result of the Data Breach, Plaintiff Pierce is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

231. Plaintiff Pierce has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' CDG, Duo and Cumberland's possession, is protected and safeguarded from future breaches.

232. Plaintiff Pierce greatly values her privacy, and would not have provided her Private Information to Defendants CDG, Duo and Cumberland, utilized their services, and paid for these services if she had known that her Private Information would be maintained using inadequate data security.

***Plaintiff Watson***

233. Plaintiff Watson is a former customer of Defendants CDG, Duo and Cumberland.

234. Defendants CDG, Duo and Cumberland obtained Plaintiff Watson's Private Information in the course of its regular business operations.

235. Upon information and belief, at the time of the Data Breach, Defendants CDG, Duo and Cumberland maintained and had access to Plaintiff Watson's Private Information.

236. Plaintiff Watson received a Notice Letter from Defendants CDG, Duo and Cumberland after the Data Breach. According to the Notice Letter, Plaintiff Watson's Private Information was improperly accessed and obtained by unauthorized third parties, including her: name, address, date of birth, and Social Security number.

237. Plaintiff Watson is very careful about sharing her Private Information. Plaintiff Watson stores any documents containing her Private Information in a safe and secure location. Plaintiff Watson has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source. Plaintiff Watson would not have entrusted her Private Information to Defendants CDG, Duo and Cumberland had she known of Defendants' CDG, Duo and Cumberland's lax data security.

238. To obtain services from Defendants CDG, Duo and Cumberland, Plaintiff Watson was required to provide her Private Information to Defendants CDG, Duo and Cumberland. This included, among other things, her name, date of birth, address, Social Security number, and financial information to make payments online.

239. As a result of the Data Breach, Plaintiff Watson made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff Watson has spent significant time dealing with the Data Breach—valuable time

Plaintiff Watson otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

240. As a result of the Data Breach, Plaintiff Watson made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing her credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Watson monitors her Private Information and has already spent many hours dealing with the Data Breach. This is valuable time Plaintiff Watson otherwise would have spent on other activities.

241. Plaintiff Watson suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (a) invasion of privacy; (b) theft of Private Information; (c) lost or diminished value of Private Information; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (e) loss of benefit of the bargain; (f) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (g) statutory damages; (h) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (1) remains unencrypted and available for unauthorized third parties to access and abuse; and (2) remains in Defendants' CDG, Duo and Cumberland's possession and is subject to further unauthorized disclosures so long as Defendants CDG, Duo and Cumberland fail to undertake appropriate and adequate measures to protect her Private Information.

242. Plaintiff Watson suffered actual injury from the Data Breach through a dramatic increase in spam, suggesting that her Private Information has been stolen and is now in the hands of cybercriminals.

243. The Data Breach has caused Plaintiff Watson to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants CDG, Duo and Cumberland have still not fully informed her of key details about the Data Breach's occurrence.

244. As a result of the Data Breach, Plaintiff Watson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

245. As a result of the Data Breach, Plaintiff Watson is at a present risk and will continue to be at increased risk of identity theft and fraud for the rest of her life.

246. Plaintiff Watson has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' CDG, Duo and Cumberland's possession, is protected and safeguarded from future data breaches.

247. Plaintiff Watson greatly values her privacy, and would not have provided her Private Information to Defendants CDG, Duo and Cumberland, utilized their services, and paid for these services if she had known that her Private Information would be maintained using inadequate data security.

***Plaintiff Bennett***

248. Plaintiff Bennet is a former customer of Defendants CDG, Duo and Cumberland.

249. Defendants CDG, Duo and Cumberland obtained Plaintiff Bennett's Private Information in the course of their regular business operations.

250. Upon information and belief, at the time of the Data Breach, Defendants CDG, Duo and Cumberland maintained and had access to Plaintiff Bennett's Private Information in their systems.

251. Plaintiff Bennett received the Notice Letter from Defendants CDG, Duo and Cumberland after the Data Breach. According to the Notice Letter, Plaintiff Bennett's Private Information was improperly accessed and obtained by unauthorized third parties including: name, address, date of birth, and Social Security number.

252. Plaintiff Bennett is very careful about sharing her Private Information. Plaintiff Bennett stores any documents containing her Private Information in a safe and secure location. Plaintiff Bennett has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source. Plaintiff Bennett would not have entrusted her Private Information to Defendants CDG, Duo and Cumberland had she known of Defendants' CDG, Duo and Cumberland's lax data security.

253. To obtain services from Defendants, Plaintiff Bennett was required to provide her Private Information to Defendants, including among other things, her name, date of birth, address, Social Security Number, and financial information to make payments online.

254. As a result of the Data Breach, Plaintiff Bennett made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff Bennett has spent significant time dealing with the Data Breach—valuable time Plaintiff Bennett otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

255. As a result of the Data Breach, Plaintiff Bennett made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Bennett monitors her Private Information and has already spent

many hours dealing with the Data Breach, valuable time Plaintiff Bennett otherwise would have spent on other activities.

256. Plaintiff Bennett suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' CDG, Duo and Cumberland's possession and is subject to further unauthorized disclosures so long as Defendants CDG, Duo and Cumberland fail to undertake appropriate and adequate measures to protect the Private Information.

257. Plaintiff Bennett suffered actual injury from fraudulent charges to her accounts, including one charge for $8 and another for $80. The fraudulent charges also resulted in an overdraft fee, and Plaintiff Bennett was forced to spend a significant amount of time without access to the stolen funds until the fraudulent charges were reimbursed.

258. Plaintiff Bennett suffered actual injury from the dramatic increase in spam, suggesting that Private Information has been stolen and is now in the hands of cybercriminals.

259. The Data Breach has caused Plaintiff Bennett to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants CDG, Duo and Cumberland have still not fully informed him of key details about the Data Breach's occurrence.

260. As a result of the Data Breach, Plaintiff Bennett anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

261. As a result of the Data Breach, Plaintiff Bennett is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

262. Plaintiff Bennett has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' CDG, Duo and Cumberland's possession, is protected and safeguarded from future breaches.

263. Plaintiff Bennett greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did if she had known that her would be maintained using inadequate data security systems.

***Plaintiff Firkins***

264. Plaintiff Firkins (referred to as "Plaintiff" in this section) is a former customer of Defendant, and Defendant obtained Plaintiff's Private Information in the course of its regular business operations.

265. Upon information and belief, at the time of the Data Breach, Defendants CDG, Duo and Cumberland maintained and had access to Plaintiff Firkins' Private Information in its system.

266. Plaintiff Firkins received the Notice letter, by U.S. mail, directly from Defendants CDG, Duo and Cumberland, which was dated May 15, 2025. According to the Notice Letter, Plaintiff Firkins' Private Information was improperly accessed and obtained by unauthorized third parties including: name, address, date of birth, and Social Security number.

267. Plaintiff Firkins is very careful about sharing her Private Information. Plaintiff Firkins stores any documents containing her Private Information in a safe and secure location. She

has never knowingly transmitted unencrypted sensitive her Private Information over the internet or any other unsecured source. Plaintiff Firkins would not have entrusted her Private Information to Defendants CDG, Duo and Cumberland had she known of Defendants CDG, Duo and Cumberland’s lax data security policies.

268. In order and as a condition to obtain services from Defendants CDG, Duo and Cumberland, Plaintiff Firkins was required to provide her Private Information to Defendants CDG, Duo and Cumberland, including among other things, her name, date of birth, address, Social Security Number, and financial information to make payments online.

269. As a result of the Data Breach, Plaintiff Firkins made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff Firkins has spent significant time dealing with the Data Breach—valuable time Plaintiff Firkins otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

270. As a result of the Data Breach, Plaintiff Firkins made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Firkins monitors her Private Information and has already spent many hours dealing with the Data Breach; valuable time Plaintiff Firkins otherwise would have spent on other activities.

271. Plaintiff Firkins suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data

Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants CDG, Duo and Cumberland's possession and is subject to further unauthorized disclosures so long as Defendants CDG, Duo and Cumberland fail to undertake appropriate and adequate measures to protect the Private Information.

272. Plaintiff Firkins suffered actual injury from the dramatic increase in spam, suggesting that Private Information has been stolen and is now in the hands of cybercriminals. The spam received included several loan applications, which indicated to Plaintiff Firkins her unauthorized persons were attempting to utilize her Private Information.

273. The Data Breach has caused Plaintiff Firkins to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

274. As a result of the Data Breach, Plaintiff Firkins anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harm caused by the Data Breach.

275. As a result of the Data Breach, Plaintiff Firkins is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

276. Plaintiff Firkins has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' CDG, Duo and Cumberland's possession, is protected and safeguarded from future breaches.

277. Plaintiff Firkins greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did if she had known that her would be maintained using inadequate data security systems.

***Plaintiff Haenel***

278. Plaintiff Haenel is a customer of Defendants CDG and Telecom.

279. Defendants CDG and Telecom obtained Plaintiff Haenel's Private Information in the course of their regular business operations.

280. Upon information and belief, at the time of the Data Breach, Defendants CDG and Telecom maintained and had access to Plaintiff Haenel's Private Information in their systems.

281. Plaintiff Haenel received a Notice Letter from Defendant Telecom after the Data Breach. According to the Notice Letter, Plaintiff Haenel's Private Information was improperly accessed and obtained by unauthorized third parties including: name, address, and Social Security number.

282. Plaintiff Haenel is very careful about sharing her Private Information. Plaintiff Haenel stores any documents containing her Private Information in a safe and secure location. Plaintiff Haenel has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source. Plaintiff Haenel would not have entrusted her Private Information to Defendants CDG and Telecom had she known of Defendants' CDG and Telecom's lax data security.

283. To obtain services from Defendants CDG and Telecom, Plaintiff Haenel was required to provide her Private Information to Defendants, including among other things, her name, address, Social Security Number, and financial information to make payments online.

284. As a result of the Data Breach, Plaintiff Haenel made reasonable efforts to mitigate

the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff Haenel has spent significant time dealing with the Data Breach—valuable time Plaintiff Haenel otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

285. As a result of the Data Breach, Plaintiff Haenel made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Haenel monitors her Private Information and has already spent many hours dealing with the Data Breach; valuable time Plaintiff Haenel otherwise would have spent on other activities.

286. Plaintiff Haenel suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' CDG and Telecom's possession and is subject to further unauthorized disclosures so long as Defendants CDG and Telecom fail to undertake appropriate and adequate measures to protect the Private Information.

287. The Data Breach has caused Plaintiff Haenel to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants CDG and Telecom have still not fully

informed him of key details about the Data Breach's occurrence.

288. As a result of the Data Breach, Plaintiff Haenel anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harm caused by the Data Breach.

289. As a result of the Data Breach, Plaintiff Haenel is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

290. Plaintiff Haenel has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' CDG and Telecom's possession, is protected and safeguarded from future breaches.

291. Plaintiff Haenel greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did if she had known that her would be maintained using inadequate data security systems.

***Plaintiff Ware***

292. Plaintiff Ware is a customer of Defendants CDG and Telecom.

293. Defendants CDG and Telecom obtained Plaintiff Ware's Private Information in the course of their regular business operations.

294. Upon information and belief, at the time of the Data Breach, Defendants CDG and Telecom maintained and had access to Plaintiff Ware's Private Information in their systems.

295. Plaintiff Ware received a Notice Letter from Defendant Telecom after the Data Breach. According to the Notice Letter, Plaintiff Ware's Private Information was improperly accessed and obtained by unauthorized third parties including: name, address, and Social Security number.

296. Plaintiff Ware is very careful about sharing her Private Information. Plaintiff Ware stores any document containing her Private Information in a safe and secure location. Plaintiff

Ware has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source. Plaintiff Ware would not have entrusted her Private Information to Defendants CDG and Telecom had she known of Defendants' CDG and Telecom's lax data security.

297. To obtain services from Defendants CDG and Telecom, Plaintiff Ware was required to provide her Private Information to Defendants, including among other things, her name, address, Social Security Number, and financial information to make payments online.

298. As a result of the Data Breach, Plaintiff Ware made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff Ware has spent significant time dealing with the Data Breach—valuable time Plaintiff Ware otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

299. As a result of the Data Breach, Plaintiff Ware made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Ware monitors her Private Information and has already spent many hours dealing with the Data Breach; valuable time Plaintiff Ware otherwise would have spent on other activities.

300. Plaintiff Ware suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to

mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' CDG and Telecom's possession and is subject to further unauthorized disclosures so long as Defendants CDG and Telecom fail to undertake appropriate and adequate measures to protect the Private Information.

301. The Data Breach has caused Plaintiff Ware to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants CDG and Telecom have still not fully informed him of key details about the Data Breach's occurrence.

302. As a result of the Data Breach, Plaintiff Ware anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

303. As a result of the Data Breach, Plaintiff Ware is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

304. Plaintiff Ware has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' CDG and Telecom's possession, is protected and safeguarded from future breaches.

305. Plaintiff Ware greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did if she had known that her would be maintained using inadequate data security systems.

***Plaintiff Acuna***

306. Plaintiff Acuna is a customer of Defendants CDG and Telecom.

307. Defendants CDG and Telecom obtained Plaintiff Acuna's Private Information in

the course of their regular business operations.

308. Upon information and belief, at the time of the Data Breach, Defendants CDG and Telecom maintained and had access to Plaintiff Acuna's Private Information in their systems.

309. Plaintiff Acuna received a Notice Letter from Defendant Telecom after the Data Breach. According to the Notice Letter, Plaintiff Acuna's Private Information was improperly accessed and obtained by unauthorized third parties including: name, address, and Social Security number.

310. Plaintiff Acuna is very careful about sharing her Private Information. Plaintiff Acuna stores any documents containing her Private Information in a safe and secure location. Plaintiff Acuna has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source. Plaintiff Acuna would not have entrusted her Private Information to Defendants CDG and Telecom had she known of Defendants' CDG and Telecom's lax data security.

311. To obtain services from Defendants CDG and Telecom, Plaintiff Acuna was required to provide her Private Information to Defendants, including among other things, her name, address, Social Security Number, and financial information to make payments online.

312. As a result of the Data Breach, Plaintiff Acuna made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff Acuna has spent significant time dealing with the Data Breach—valuable time Plaintiff Acuna otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

313. As a result of the Data Breach, Plaintiff Acuna made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and

reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Acuna monitors her Private Information and has already spent many hours dealing with the Data Breach; valuable time Plaintiff Acuna otherwise would have spent on other activities.

314. Plaintiff Acuna suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' CDG and Telecom's possession and is subject to further unauthorized disclosures so long as Defendants CDG and Telecom fail to undertake appropriate and adequate measures to protect the Private Information.

315. The Data Breach has caused Plaintiff Acuna to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants CDG and Telecom have still not fully informed him of key details about the Data Breach's occurrence.

316. As a result of the Data Breach, Plaintiff Acuna anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

317. As a result of the Data Breach, Plaintiff Acuna is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

318. Plaintiff Acuna has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' CDG and Telecom's possession, is protected and safeguarded from future breaches.

319. Plaintiff Acuna greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did if she had known that her would be maintained using inadequate data security systems.

***Plaintiff Daniell***

320. Plaintiff Daniell is a customer of Defendants CDG and Telecom.

321. Defendants CDG and Telecom obtained Plaintiff Daniell's Private Information in the course of their regular business operations.

322. Upon information and belief, at the time of the Data Breach, Defendants CDG and Telecom maintained and had access to Plaintiff Daniell's Private Information in their systems.

323. Plaintiff Daniell received a Notice Letter from Defendant Telecom after the Data Breach. According to the Notice Letter, Plaintiff Daniell's Private Information was improperly accessed and obtained by unauthorized third parties including: name, address, and Social Security number.

324. Plaintiff Daniell is very careful about sharing his Private Information. Plaintiff Daniell stores any documents containing his Private Information in a safe and secure location. Plaintiff Daniell has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source. Plaintiff Daniell would not have entrusted his Private Information to Defendants CDG and Telecom had she known of Defendants' CDG and Telecom's lax data security.

325. To obtain services from Defendants CDG and Telecom, Plaintiff Daniell was

required to provide his Private Information to Defendants, including among other things, his name, address, Social Security Number, and financial information to make payments online.

326. As a result of the Data Breach, Plaintiff Daniell made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff Daniell has spent significant time dealing with the Data Breach—valuable time Plaintiff Daniell otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

327. As a result of the Data Breach, Plaintiff Daniell was locked out of his Telecom account. As a result, Plaintiff Daniell spent significant time calling Telecom to address this issue.

328. Plaintiff Daniell suffered actual injury from the Data Breach through a dramatic increase in spam, suggesting that his Private Information has been stolen and is now in the hands of cybercriminals.

329. As a result of the Data Breach, Plaintiff Daniell made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Daniell monitors his Private Information and has already spent many hours dealing with the Data Breach; valuable time Plaintiff Daniell otherwise would have spent on other activities.

330. Plaintiff Daniell suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to

mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' CDG and Telecom's  possession and is subject to further unauthorized disclosures so long as Defendants CDG and Telecom fail to undertake appropriate and adequate measures to protect the Private Information.

331. The Data Breach has caused Plaintiff Daniell to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants CDG and Telecom have still not fully informed him of key details about the Data Breach's occurrence.

332. As a result of the Data Breach, Plaintiff Daniell anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

333. As a result of the Data Breach, Plaintiff Daniell is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

334. Plaintiff Daniell has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' CDG and Telecom's possession, is protected and safeguarded from future breaches.

335. Plaintiff Daniell greatly values his privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that he did if she had known that her would be maintained using inadequate data security systems.

## VI. CLASS ACTION ALLEGATIONS

336. Plaintiffs bring this nationwide class action on behalf of themselves, and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

337. The Class Plaintiffs seek to represent is defined as follows ("Class"):

**Nationwide Class:**

All United States citizens whose Private Information was compromised in the Data Breach, including all persons who were sent a Notice Letter by Defendants.

338. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

339. Plaintiffs reserve the right to amend the definition of the Class or add a Class or Subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

340. Numerosity. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiffs and exclusively in the possession of CDG, upon information and belief, the number of individuals impacted is approximately 42,518.

341. Commonality. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a. Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiffs and Class Members.

b. Whether CDG had the duty not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties.

c. Whether CDG had the duty not to use the Private Information of Plaintiffs and Class Members for non-business purposes.

d. Whether Defendants failed to safeguard the Private Information of Plaintiffs and Class Members.

e. Whether and when CDG actually learned of the Data Breach.

f. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised.

g. Whether Defendants violated the law by failing to timely notify Plaintiffs and Class Members that their Private Information had been compromised.

h. Whether CDG failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach.

i. Whether Duo, Cumberland, and Telecom failed to ensure CDG implemented and maintained reasonable data security procedures and practices to prevent the Data Breach.

j. Whether CDG adequately addressed and fixed the vulnerabilities that permitted the Data Breach to occur.

k. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct; and,

l. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

342. Typicality. Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

343. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

344. Adequacy. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

345. Superiority and Manageability. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and

expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

346. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

347. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

348. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

349. Unless a Class-wide injunction is issued, Defendants may continue to inadequately protect and secure the Private Information of Class Members, may continue to refuse to provide

proper notification to Class Members regarding the Data Breach, and may continue to act unlawfully as set forth in this Complaint.

350. Further, Defendants acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

351. Likewise, particular issues under Rule 23(c)(2) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants failed to timely notify the Plaintiffs and the class of the Data Breach.

b. Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information and selecting vendors and/or independent contractors.

c. Whether Duo, Cumberland, and Telecom owed a legal duty to ensure CDG implemented and maintained reasonable data security procedures and practices to prevent the Data Breach.

d. Whether CDG's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts.

e. Whether CDG's failure to institute adequate protective security measures amounted to negligence.

f. Whether CDG failed to take commercially reasonable steps to safeguard their customers' Private Information; and,

g. Whether adherence to FTC Act and measures recommended by data security experts would have reasonably prevented the Data Breach.

## VII. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/NEGLIGENCE PER SE
### (On Behalf of Plaintiffs and the Nationwide Class against CDG)

352. Plaintiffs re-allege and incorporate by reference paragraphs 1–351 above as if fully set forth herein.

353. CDG solicited, gathered, and stored the Private Information of Plaintiffs and Class Members.

354. Upon accepting and storing the Private Information of Plaintiffs and Class Members on its computer systems and networks, CDG undertook and owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information of Plaintiffs and the Class from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

355. CDG had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiffs and the Class Members had no ability to protect their Private Information that was in CDG's possession. As such, a special relationship existed between CDG and Plaintiffs and the Class.

356. Because of this special relationship, CDG required Plaintiffs and Class Members to provide their Private Information, including names, Social Security numbers, and other Private Information.

357. Implied in these exchanges was a promise by CDG to ensure that the Private Information of Plaintiffs and Class Members in its possession was only used for the purpose provided and that CDG would destroy any Private Information that it was not required to maintain.

358. As part of this special relationship, CDG had a duty to perform with skill, care, and reasonable expedience and faithfulness.

359. Through CDG's acts and omissions, including CDG's failure to provide adequate data security, its failure to protect Plaintiffs' and Class Members' Private Information from being foreseeably accessed, and its improper retention of Private Information it was not required to maintain, CDG negligently failed to observe and perform its duty.

360. Plaintiffs and Class Members did not receive the benefit of the bargain with CDG, because providing their Private Information was in exchange for CDG's implied agreement to secure and keep it safe and to delete it once no longer required.

361. CDG was aware of the fact that cybercriminals routinely target businesses such as CDG through cyberattacks in an attempt to steal Private Information. In other words, CDG knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures.

362. CDG owed Plaintiffs and the Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing Private Information, including taking action to reasonably safeguard or delete such Private Information and providing notification to Plaintiffs and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

363. CDG's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the

actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

364. CDG had duties to protect and safeguard the Private Information of Plaintiffs and the Class from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive Private Information. Additional duties that CDG owed Plaintiffs, and the Class include:

365. To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing CDG's email accounts, networks, systems, protocols, policies, procedures, and practices to ensure that Plaintiffs' and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication.

366. To protect Plaintiffs' and Class Members' Private Information in its possession by using reasonable and adequate security procedures and systems.

367. To implement processes to quickly detect a data breach, security incident, or intrusion involving its email accounts, networks, and servers; and

368. To promptly notify Plaintiffs and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

369. Plaintiffs and the Class were the intended beneficiaries of CDG's duties, creating a special relationship between them and CDG. CDG was in a position to ensure that its systems were sufficient to protect the Private Information that Plaintiffs and the Class had entrusted to it.

370. Plaintiffs' injuries and damages, as described herein, are a reasonably certain consequence of CDG's negligence and breach of its duties.

371. CDG breached its duties of care by failing to adequately protect Plaintiffs' and

Class Members' Private Information. CDG breached its duties by, among other things:

372. Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, and protecting the Private Information in its possession.

373. Failing to protect the Private Information in its possession using reasonable and adequate security procedures and systems.

374. Failing to consistently enforce security policies aimed at protecting Plaintiffs and the Class's Private Information.

375. Failing to implement processes to quickly detect data breaches, security incidents, or intrusions.

376. Failing to promptly notify Plaintiffs and Class Members of the Data Breach that affected their Private Information.

377. CDG's willful failure to abide by these duties was wrongful, reckless, and grossly negligent considering the foreseeable risks and known threats.

378. As a direct and proximate result of CDG's negligent conduct, including but not limited to its failure to implement and maintain reasonable data security practices and procedures as described above, Plaintiffs and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

379. Through CDG's acts and omissions described herein, including but not limited to CDG's failure to protect the Private Information of Plaintiffs and Class Members from being stolen and misused, CDG unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiffs and Class Members while it was within CDG's possession and control.

380. Further, through its failure to provide timely and clear notification of the Data

Breach to Plaintiffs and Class Members, CDG prevented Plaintiffs and Class Members from taking meaningful, proactive steps to securing their Private Information and mitigating damages.

381. Plaintiffs and Class Members could have taken actions earlier had they been timely notified of the Data Breach. Plaintiffs and Class Members could have enrolled in credit monitoring, could have instituted credit freezes, and could have changed their passwords, among other things, had they been alerted to the Data Breach more quickly.

382. Plaintiffs and Class Members have suffered harm from the delay in notifying them of the Data Breach.

383. As a direct and proximate cause of CDG's conduct, including but not limited to its failure to implement and maintain reasonable security practices and procedures, Plaintiffs and Class Members have suffered, as Plaintiffs have, and/or will suffer injury and damages, including but not limited to: (a) the loss of the opportunity to determine for themselves how their Private Information is used; (b) the publication and/or theft of their Private Information; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and identity protection services for an extended period of time; (d) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (e) costs associated with placing freezes on credit reports and password protections; (f) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (g) the continued risk to their Private Information, which remains in CDG's possession and is subject to further unauthorized disclosures so long as CDG fails to undertake appropriate and adequate measures to

protect the Private Information of employees in its continued possession; and (h) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

384. The damages Plaintiffs and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of CDG's negligent conduct.

385. Plaintiffs and the Class have suffered injury and are entitled to actual and punitive damages in an amount to be proven at trial.

386. Pursuant to the FTC Act, 15 U.S.C. § 45(a), CDG had also a duty to Plaintiffs and the Class to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and the Class.

387. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as CDG, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also formed part of the basis of CDG's duty in this regard.

388. CDG gathered and stored the Private Information of Plaintiffs and the Class as part of its business which affects commerce.

389. CDG violated the FTC Act by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

390. CDG breached its duties to Plaintiffs and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiffs' and Class Members' Private Information, and by failing to provide prompt notice

without reasonable delay.

391. CDG's multiple failures to comply with applicable laws and regulations constitute negligence *per se*.

392. Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

393. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.

394. CDG breached its duties to Plaintiffs and the Class under the FTC Act by failing to provide fair, reasonable, or adequate email accounts, computer systems, and data security practices to safeguard Plaintiffs' and the Class's Private Information.

395. CDG breached its duties to Plaintiffs and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiffs and the Class.

396. CDG's violations of the FTC Act constitute negligence *per se*.

397. As a direct and proximate result of CDG's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

398. The injury and harm that Plaintiffs and Class Members suffered (as alleged above) was the direct and proximate result of CDG's negligence *per se*.

399. Plaintiffs and the Class have suffered injury and are entitled to damages in amounts to be proven at trial.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Nationwide Class against all Defendants)**

400. Plaintiffs re-allege and incorporate by reference paragraphs 1–351 above as if fully set forth herein and bring this claim against all Defendants.

401. Defendants required Plaintiffs and Class Members to provide and entrust their Private Information to Defendants as a condition of obtaining services.

402. When Plaintiffs and Class Members provided their Private Information to Defendants, they entered into implied contracts with Defendants. Pursuant to these contracts, Defendants agreed, as manifested through their conduct, to safeguard and protect such Private Information and to timely and accurately notify Plaintiffs and Class Members if and when their Private Information was breached and compromised.

403. Specifically, Plaintiffs and Class Members entered into valid and enforceable implied contracts with Defendants when they agreed to provide their Private Information and/or payment to Defendants, and Defendants agreed to collect, maintain, and profit from that Private Information.

404. The valid and enforceable implied contracts that Plaintiffs and Class Members entered into with Defendants included Defendants' promises to protect Private Information they collected from Plaintiffs and Class Members against unauthorized disclosures. Plaintiffs and Class Members provided this Private Information in reliance on Defendants' promises.

405. Under the implied contracts, Defendants promised and were obligated to protect Plaintiffs' and Class Members' Private Information provided to obtain services. In exchange, Plaintiffs and Class Members agreed to provide Defendants with their Private Information.

406. Defendants promised and warranted to Plaintiffs and Class Members, through privacy documents and conduct, to maintain the privacy and confidentiality of the Private Information they collected from Plaintiffs and Class Members and to keep such information safeguarded against unauthorized access and disclosure.

407. Defendants' adequate protection of Plaintiffs' and Class Members' Private Information was a material aspect of these implied contracts with Defendants.

408. Defendants solicited and invited Plaintiffs and Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their Private Information to Defendants.

409. By entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that: (a) CDG's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act; and (b) that Duo, Cumberland, and Telecom would ensure any vendors and/or independent contractors they selected and utilized complied with industry standards and relevant laws and regulations, including the FTC Act.

410. Plaintiffs also reasonably believed that Duo and Cumberland would properly vet and inquire into the data security of any vendor and/or independent contractor it used—such as CDG—to ensure their Private Information was adequately protected and not susceptible to data breaches.

411. Plaintiffs and Class Members, who contracted with Defendants, provided their Private Information to Defendants and reasonably believed and expected that (a) CDG would employ adequate data security; and (b) Duo, Cumberland, and Telecom would utilize vendors and/or independent contractors with adequate data security to protect their Private Information. However, Defendants utterly failed to do so.

412. A meeting of the minds occurred when Plaintiffs and Class Members agreed to, and did, provide their Private Information to Defendants and agreed Defendants would receive payment for and benefit from, amongst other things, the protection of their Private Information.

413. Plaintiffs and Class Members performed their obligations under the contracts when they provided their Private Information and/or payment to Defendants.

414. Defendants materially breached their contractual obligations to protect the Private Information they required Plaintiffs and Class Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to: (a) CDG's inadequate data security measures and procedures; and (b) Duo's Cumberland's, and Telecom' failure to ensure their vendors and/or independent contractors—such as CDG—had adequate data security measures and procedures in place.

415. Defendants materially breached their contractual obligations to deal in good faith with Plaintiffs and Class Members when: (a) CDG failed to take adequate precautions to prevent the Data Breach; (b) Duo, Cumberland, and Telecom failed to ensure CDG took adequate precautions to prevent a data breach; and (c) Defendants failed to timely or adequately notify Plaintiffs and Class Members about the Data Breach.

416. The Data Breach was a reasonably foreseeable consequence of Defendants' conduct, by acts of omission or commission, in breach of these implied contracts with Plaintiffs and Class Members.

417. As a result of CDG's failure to fulfill the data security protections promised in these contracts and Duo's failure to utilize vendors and/or contractors with adequate data security protections, Plaintiffs and Class Members did not receive the full benefit of their bargains with Defendants and instead received services of a diminished value compared to that described in the

implied contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they were promised and that which they received.

418. Had CDG disclosed that its data security procedures were inadequate or that it did not adhere to industry standards for cybersecurity, neither Plaintiffs, Class Members, nor any reasonable person would have contracted with CDG.

419. Similarly, had Duo, Cumberland, and Telecom disclosed that they would be using a vendor and/or independent contractor with inadequate data security or that it would not be vetting potential vendors and/or independent contractors to ensure they had adequate data security Plaintiffs, and the Class would not have contracted with Duo, Cumberland, and/or Telecom.

420. Plaintiffs and Class Members would not have provided and entrusted their Private Information to Defendants in the absence of the implied contracts between them and Defendants.

421. Plaintiffs and Class Members fully performed their obligations under their implied contracts with Defendants.

422. Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or restitution damages, in an amount to be proven at trial, due to Defendants' breach of implied contract.

**COUNT III**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**<u>(On Behalf of Plaintiffs and the Nationwide Class against Defendant CDG)</u>**

423. Plaintiffs re-allege and incorporate by reference paragraphs 1–351 above as if fully set forth herein and bring this claim against Defendant CDG.

424. This Count is alleged in the alternative where necessary.

425. CDG entered into uniform written contracts with its clients, including Duo, Cumberland, and Telecom, to provide services.

426. Pursuant these contracts, CDG received from Duo, Cumberland and Telecom and maintained Plaintiffs' and Class Members' Private Information in the course of performing its contractual services, which it could not perform without receiving and maintaining such Private Information.

427. Pursuant to these contracts, CDG's clients, including Duo, Cumberland, and Telecom, agreed to provide CDG with compensation and Plaintiffs' and Class Members' Private Information.

428. In exchange, CDG agreed, in part, to implement adequate data security measures to safeguard Plaintiffs' and Class Members' Private Information from unauthorized disclosure, and to timely notify Plaintiffs and Class Members of the Data Breach.

429. CDG was required by statutes and regulations, including but not limited to the FTC Act and state consumer privacy and protection laws, to have contracts with its clients that required CDG to implement and maintain reasonable security procedures and practices to protect Plaintiffs and Class Members Private Information from unauthorized access, use, or disclosure.

430. The relevant statutes and regulations obligating CDG to promise by contract to use reasonable data security for Plaintiffs' and Class Members' Private Information create a class of intended beneficiaries whose members are implied into such agreements by operation of law. Plaintiffs and Class Members are the intended beneficiaries of the contracts that CDG entered into with Duo, Cumberland, and Telecom.

431. Upon information and belief, CDG's contracts with Duo, Cumberland, and Telecom each contained a provision requiring CDG to implement and maintain reasonable security

procedures and practices appropriate to the nature of Private Information CDG collected, to protect the Private Information from unauthorized access, use, or disclosure.

432. These contracts between CDG and Duo, Cumberland, and Telecom were made expressly for the benefit of Plaintiffs and Class Members as the intended third-party beneficiaries of these contracts.

433. CDG knew Plaintiffs and Class Members were involved and would benefit from the transactions that were subject to these contracts between CDG and Duo, Cumberland, and Telecom.

434. CDG knew that if it breached its contractual obligation to adequately safeguard Plaintiffs' and Class Members' Private Information, Plaintiffs and Class Members would be harmed.

435. CDG breached these contracts with Duo, Cumberland, and Telecom by, among other acts and omissions: (a) failing to use reasonable data security measures, (b) failing to implement adequate protocols and employee training sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure, and (c) failing to promptly or adequately notify Plaintiffs and Class Members of the Data Breach.

436. As a direct and proximate result of CDG's breaches of these contracts with Duo, Cumberland, and Telecom, Plaintiffs and Class Members have suffered and will continue to suffer injuries as set forth herein and are entitled to damages sufficient to compensate for the losses they sustained.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class against all Defendants)**

437. Plaintiffs re-allege and incorporate by reference paragraphs 1–351 above as if fully

set forth herein and bring this claim against all Defendants.

438. Plaintiffs plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein, to the extent Plaintiffs and Class Members may not have an adequate remedy at law against Defendants.

439. Plaintiffs and Class Members conferred a monetary benefit on Defendants. Specifically, they provided their Private Information to Defendants. In exchange, Plaintiffs and Class Members should have had their Private Information protected with adequate data security. Without the collection and receipt of Plaintiffs' and the Class's Private Information, Defendants would not be able to provide services and would be unable to obtain revenue.

440. Plaintiffs also provided monetary payments to Defendants to receive telecommunications services. Part of this payment should have been specifically allocated towards data security.

441. Defendants knew Plaintiffs and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the Private Information entrusted to them, and indeed, generating revenue from doing so. Defendants profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

442. Defendants failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

443. Defendants acquired the Private Information through inequitable means as they failed to investigate and/or disclose the inadequate data security practices as alleged herein.

444. CDG enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information.

445. Duo, Cumberland, and Telecom enriched themselves by saving the costs they reasonably should have expended on a vendor and/or independent contractor with adequate data security measures to secure Plaintiffs' and Class Members' Personal Information

446. Instead of CDG providing a reasonable level of data security that would have prevented the Data Breach, and Duo, Cumberland, and Telecom utilizing a vendor and/or independent contractor with a reasonable level of data security that would have prevented the Data Breach, Defendants calculated to increase their own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and vendors and/or independent contractors and diverting those funds to their own pockets. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decisions to prioritize their own profits over the requisite security of customers' Private Information.

447. Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

448. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injuries and damages as set forth herein.

449. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

**COUNT V**
**DECLARATORY JUDGMENT**
**<u>(On behalf of Plaintiffs and the Nationwide Class against all Defendants)</u>**

450. Plaintiffs re-allege and incorporate by reference paragraphs 1–351 above as if fully

set forth herein and bring this claim against all Defendants.

451. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary supplemental relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

452. In the fallout of the Data Breach, a controversy has arisen about: (a) CDG's duties to use reasonable data security for the Private Information it collects and maintains; and (b) Duo's, Cumberland's, and Telecom's duties to use vendors and/or independent contractors with reasonable data security for the Private Information it collects and maintains.

453. On information and belief, Defendants' actions were—and still are—inadequate and unreasonable. Plaintiffs and Class Members continue to suffer injuries from the ongoing threat of fraud and identity theft due to CDG's inadequate data security measures and Duo's, Cumberland's, and Telecom's failure to use vendors and/or independent contractors with adequate data security measures.

454. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring as follows:

a. CDG owed—and continues to owe—a legal duty to use reasonable data security to secure the Private Information entrusted to it.

b. Duo owed—and continues to owe—a legal duty to ensure any vendors and/or contractors it hires use reasonable data security to secure the Private Information entrusted to it.

c. Cumberland owed—and continues to owe—a legal duty to ensure any vendors and/or contractors it hires use reasonable data security to secure the Private

Information entrusted to it.

d. Telecom owed—and continues to owe—a legal duty to ensure any vendors and/or contractors it hires use reasonable data security to secure the Private Information entrusted to it.

e. Defendants have a duty to notify impacted individuals of the Data Breach under common law, Section 5 of the FTC Act.

f. CDG breached, and continues to breach, its duties by failing to use reasonable measures to protect the Private Information entrusted to it from unauthorized access, use, and disclosure

g. Duo breached, and continues to breach, its duties by failing to ensure the vendors and/or contractors it utilizes deploy adequate data security and/or by willingly using vendors and/or contractors who fail to use reasonable measures to protect the Private Information.

h. Cumberland breached, and continues to breach, its duties by failing to ensure the vendors and/or contractors it utilizes deploy adequate data security and/or by willingly using vendors and/or contractors who fail to use reasonable measures to protect the Private Information.

i. Telecom breached, and continues to breach, its duties by failing to ensure the vendors and/or contractors it utilizes deploy adequate data security and/or by willingly using vendors and/or contractors who fail to use reasonable measures to protect the Private Information; and Defendants' breaches of their duties caused—and continue to cause—injuries to Plaintiffs and Class Members.

455. The Court should also issue injunctive relief requiring CDG to use adequate data

security consistent with industry standards and Duo, Cumberland, and Telecom to use vendors and/or independent contractors with adequate security consistent with industry standards.

456. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injuries and lack an adequate legal remedy if a second data breach occurs. And if a second breach occurs, Plaintiffs and Class Members will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full, and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted for out-of-pocket damages and other legally quantifiable and provable damages, cannot cover the full extent of Plaintiffs' and Class Members' injuries.

457. If an injunction is not issued, the resulting hardship for Plaintiffs and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

458. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

**COUNT VI**
**NEGLIGENT SELECTION, HIRING, OR RETENTION**
**(On behalf of Plaintiffs and the Nationwide Class against Duo, Cumberland, and Telecom)**

459. Plaintiffs re-allege and incorporate by reference paragraphs 1–351 above as if fully set forth herein, and bring this claim against Duo, Cumberland, and Telecom.

460. Duo, Cumberland, and Telecom hired CDG to provide services.

461. Duo, Cumberland, and Telecom knew or should have known that CDG was incompetent. Plaintiffs and Class Members were injured because of the CDG's incompetence.

462. Duo, Cumberland, and Telecom allowed CDG access to the Private Information of Plaintiffs and the Class without: (a) vetting CDG and inquiring about its data security

qualifications; (b) inquiring about and/or investigating CDG's data security procedures, protocols, and infrastructure; (c) ensuring CDG had data security systems and procedures compliant the FTC Act and recognized industry standards; (d) ensuring CDG adequately secured and protected Private Information in its possession from data breaches; and/or (e) advising CDG of the confidential nature of Plaintiffs' and the Class's Private Information and its duty to protect that information.

463. If Duo, Cumberland, and Telecom would have inquired into the adequacy of CDG's data security prior to selecting, retaining, and hiring CDG, Duo, Cumberland, and Telecom would have known CDG was incompetent and incapable of adequately protecting and securing Plaintiffs' and the Class's Private Information. Reason being, Duo, Cumberland, and Telecom would have discovered CDG *did not* have data security measures in place that were compliant with the FTC Act, and recognized industry standards. Under these circumstances, Duo, Cumberland, and Telecom knew or should have known that CDG was incompetent.

464. However, Duo, Cumberland, and Telecom were negligent and failed to exercise the requisite standard of care in the hiring, selecting, and retaining CDG. As a result, a well-known cybercriminal group—Qilin—accessed and stole Plaintiffs' and the Class's Private Information and caused the damages delineated herein by virtue of the Data Breach.

465. Duo, Cumberland, and Telecom owed a duty to Plaintiffs and the Class to ensure CDG had adequate data security, procedures, and protocols sufficient to protect Plaintiffs' and the Class's Private Information from data breaches prior to hiring CDG.

466. Duo, Cumberland, and Telecom also owed a continuing duty to Plaintiffs and the Class to ensure CDG continued to employ adequate data security, procedures, and protocols sufficient to protect Plaintiffs' and the Class's Private Information from data breaches after hiring CDG.

467. Duo, Cumberland, and Telecom breached these duties by failing to ensure CDG possessed the requisite data security, procedures, practices, infrastructure, and protocols to protect Plaintiffs' and the Class's Private Information from data breaches prior to hiring CDG and while CDG worked for Duo, Cumberland, and Telecom.

468. Additionally, Duo, Cumberland, and Telecom breached their duties and obligations by: (a) failing to ensure CDG designed, implemented, monitored, and maintained reasonable network safeguards against foreseeable threats; (b) failing to ensure CDG designed, implemented, and maintained reasonable data retention policies; (c) failing to ensure CDG adequately trained or oversaw its employees regarding data security; (d) failing to ensure CDG complied with industry standard data security practices; (e) failing to ensure CDG encrypted or adequately encrypted the Private Information that was stored on CDG's network; (f) failing to ensure CDG had systems or processes in place to recognize or detect that CDG's network had been compromised and accessed; (g) failing to ensure CDG utilized widely available software able to detect and prevent data breaches; and (h) failing to ensure CDG otherwise adequately secured the Private Information of Plaintiffs and the Class using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

469. Duo, Cumberland, and Telecom were on notice of the importance of data security because of well-publicized data breaches occurring throughout the United States. Despite knowledge of prior data breaches, Duo, Cumberland, and Telecom failed to ensure CDG possessed the requisite data security posture to protect Plaintiffs' and the Class's Private Information from unauthorized disclosure.

470. Duo, Cumberland, and Telecom knew or should have known that the failure to ensure CDG employed adequate data security, procedures, and protocols would create an

unreasonable risk of danger to persons and property.

471. As a direct and proximate result of Duo, Cumberland, and Telecom's breach of its duties, and its negligent hiring, retention, and selection of CDG, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy, diminution in value of their Private Information, and actual misuse of their Private Information.

472. Upon information and belief, Duo, Cumberland, and Telecom were advised of the Data Breach, but continued to employ CDG, putting Plaintiffs and the Class at risk of more data breaches in the future.

473. The acts and omissions of Duo, Cumberland, and Telecom in negligently hiring, retaining, and/or selecting CDG are such as to show gross negligence and reckless disregard for the safety of others and, therefore, punitive damages are appropriate.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment as follows:

A. An Order certifying this case as a class action on behalf of Plaintiffs and the proposed Classes, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Classes.

B. Awarding Plaintiffs and the Classes damages that include applicable compensatory, actual, statutory, nominal, exemplary, and punitive damages, as allowed by law;

C. Awarding restitution and damages to Plaintiffs and the Classes in an amount to be determined at trial.

D. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Classes.

E. Awarding injunctive relief in the form of additional technical and administrative cybersecurity controls as is necessary to protect the interests of Plaintiffs and the Classes.

F. Enjoining Defendants from further deceptive practices and making untrue statements about their data security, the Data Breach, and the transmitted Private Information.

G. Awarding attorneys' fees and costs, as allowed by law.

H. Awarding prejudgment and post-judgment interest, as provided by law; and

I. Awarding such further relief to which Plaintiffs and the Classes are entitled.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues to triable.

Date: October 20, 2025

Respectfully submitted,

/s/ *Gary M. Klinger*
Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN LLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878
gklinger@milberg.com

William B. Federman
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
E: wbf@federmanlaw.com

Raina C. Borrelli
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100

Facsimile: (872) 263-1109
raina@straussborrelli.com
***Interim Co-Lead Class Counsel***

Andrew J. Shamis, Esq.
**SHAMIS & GENTILE P.A.**
ashamis@shamisgentile.com
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Tel: (305) 479-2299

J. Gerard Stranch, IV *(pro hac vice forthcoming)*
Grayson Wells *(pro hac vice forthcoming)*
**STRANCH, JENNINGS & GARVEY PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Leigh Montgomery *(pro hac vice forthcoming)*
Texas Bar No. 24052214
lmontgomery@eksm.com
Service only: service@eksm.com
**EKSM, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931

A. Brooke Murphy *(pro hac vice forthcoming)*
MURPHY LAW FIRM
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
T: (405) 389-4989
E: abm@murphylegalfirm.com

***Attorneys for Plaintiff and the Proposed Class***